## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ROBERT L. BREUDER,          )
                                 )
          Plaintiff,      )
    v.                       )     Case No.:  1:15-cv-9323
                                 )
BOARD OF TRUSTEES OF COMMUNITY   )     Hon. Andrea R. Wood
COLLEGE DISTRICT NO. 502, DUPAGE    )
COUNTY, ILLINOIS, an Illinois body politic and  )
corporate, KATHY HAMILTON in her official   )
and individual capacity, DEANNE MAZZOCHI  )
in her official and individual capacity, FRANK  )
NAPOLITANO in his official and individual    )
capacity, and CHARLES BERNSTEIN in his    )
official and individual capacity,             )
                                 )
          Defendants.    )

## PLAINTIFF ROBERT L. BREUDER'S OPPOSITION TO DEFENDANT BOARD OF TRUSTEES' MOTION TO DISMISS COUNTS I, II, AND IV OF THE COMPLAINT

From January 1, 2009, until his wrongful termination, Plaintiff Robert L. Breuder ("Dr. Breuder") served as President of the College of DuPage ("COD") under an Employment Contract duly executed by Defendant Board of Trustees ("Board"). During his tenure, Dr. Breuder oversaw a significant number of initiatives and improvements at COD that distinguished COD as a leader among community colleges nationwide, and which garnered Dr. Breuder much recognition amongst the academic community for his leadership skills. Despite these successes, the Board, at the behest of Board Trustees Kathleen Hamilton, Deanne Mazzochi, Frank Napolitano, and Charles Bernstein, wrongfully terminated Dr. Breuder on October 20, 2015, in violation of his Employment Contract and his Fourteenth Amendment due process rights. The termination followed months and months of slander and stigmatization by Trustees Hamilton, Mazzochi, Napolitano, and Bernstein, who were engaged in a personally motivated and malicious campaign to malign Dr. Breuder based on false charges of mismanagement, misconduct, fraud, and corruption. Prior to the termination, the Board failed to provide—and outright denied—Dr. Breuder any adequate and impartial hearing to defend the false charges made against him and clear his name. The Board now asks this Court to dismiss Dr. Breuder's due process and breach of contract claims, primarily based on the contention that the Employment Contract was void *ab initio*. As discussed below, the Employment Contract was valid and enforceable, and Dr. Breuder's claims otherwise are well pled.

## **LEGAL STANDARD**

The Board seeks dismissal of Counts I, II, and IV of Dr. Breuder's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. To state a claim under the Federal Rules, a complaint need only to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when accepted as true and in a light most favorable to plaintiff, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation

omitted); *see also Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Yeftich*, 722 F.3d at 915. Under Rule 12(b)(6), a complaint should be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ledford v. Sullivan,* 105 F.3d 354, 357 (7th Cir. 1997). By these standards, the Board's Motion to Dismiss should be denied.

## ARGUMENT

### I. COUNT I STATES A CLAIM UNDER THE FOURTEENTH AMENDMENT FOR DEPRIVATION OF DR. BREUDER'S PROPERTY RIGHTS WITHOUT DUE PROCESS

Dr. Breuder has stated a claim for a violation of his due process rights based on the Board's unlawful termination and rescission of his right to employment and other benefits conferred upon him through his Employment Contract, the January 2015 Agreement, and Board policies. The Board asserts that Dr. Breuder has failed to state such a claim because he had no protectable property interests in either of his contracts or Board policies. The Board's assertions are based on two erroneous contentions: the "Employment Agreement"[1] was void *ab initio* and Board policies relating to separation of administrative personnel do not apply to Dr. Breuder.

#### A. Dr. Breuder's Employment Contract is Enforceable and Not Void *Ab Initio*.

The Board argues that the contract is void *ab initio* because it exceeded the Board's authority under the Illinois Public Community Colleges Act, 110 ILCS 805/1-101 *et seq.* (the "Act"), and violated the Illinois Open Meetings Act, 5 ILCS 120/1-101 *et seq.* (the "OMA"). Neither argument

---

[1] The Board contends that the Complaint "defines the Employment Agreement as an employment contract dated November 18, 2008, and addenda 1-3 to that contract, . . . followed by a January 2015 Agreement as a forth addendum . . . ." Mot. at 3 n.1. That is not correct. The Complaint clearly states that the "Employment Contract," which consists of the November 18, 2008 contract and addenda 1 thru 3 to that contract, and the "January 2015 Agreement" are separate agreements and should be treated as such. *See* Cmplt. Counts I & IV, Exs. A & C; *Dearborn Maple Venture, LLC v. SCI Illinois Servs., Inc.*, 968 N.E.2d 1222, 1232, *as modified on denial of reh'g* (Ill. App. Ct. 2012) (instruments must be construed as separate agreements when there is evidence that the parties intended for the documents to be read separately). Yet, for this Opposition, arguments relating to the enforceability of the agreements apply equally to the Employment Contract and the January 2015 Agreement, unless otherwise stated.

prevails. Under the Act, the Board had broad authority to execute a contract with Dr. Breuder that included both a multi-year term and a provision limiting the Board's ability to terminate the contract. The contract also does not violate the OMA, and even if it did, that violation would render the contract voidable (not void *ab initio*) and capable of severance.

      1.   <u>The Act Provides the Board Broad Authority With Respect to Employment Matters.</u>

The Board "is a body politic and corporate" established under the Act. 110 ILCS 805/3-11.[2] The Act vests the Board with various duties and powers relating to the employment of college personnel. Section 3-26 of the Act requires the Board "[t]o make appointments and fix the salaries of a chief administrative officer, who shall be the executive officer of the board, other administrative personnel and all teachers." *Id.* § 3-26. The Board also has the power "[t]o establish tenure policies for the employment of teachers and administrative personnel, and the cause for removal," *id.* § 3-32, and "[t]o employ such personnel as may be needed, to establish policies governing their employment and dismissal, and to fix the amount of their compensation," *id.* § 3-42. In addition, Section 3-30 allows the Board to "exercise all other powers, not inconsistent with this Act, that may be requisite or proper for the maintenance, operation and development of any college or colleges under the jurisdiction of the board." *Id.* § 3-30. These provisions grant the Board broad authority with respect to employment matters. *See Steinmetz v. Bd. of Trustees of Cmty. Coll. Dist. No. 529*, 385 N.E.2d 745, 748 (Ill. App. Ct. 1978) ("The Community College Act authorized the Board to 'establish tenure policies.' This grant of authority is a very broad one."); *see also Hostrop v. Bd. of Jr. Coll. Dist. No. 515, Cook & Will Ctys. & State of Ill.*, 523 F.2d 569, 574-75 (7th Cir. 1975); *c.f.* Allen D. Schwartz, *Illinois School Finance—A Primer*, Chicago-Kent Law Review, Oct. 1980, at 831, 831 n.4 (Section 3-30 of the Act "reverses Dillon's Rule with reference to community colleges.")

---

[2] The Board states, contrary to Section 3-11 of the Act, that it is a "*non-home rule* body politic and corporate *and unit of local government*." Mot. at 3 (emphasis added); *compare with* 110 ILCS 805/3-11. Those classifications have specific meanings under Article VII of the 1970 Illinois Constitution, *see* Ill. Const. 1970, art. VII, §§ 6-8, and the Board cites no authority that a board of trustees of a community college falls under either of those classifications.

2. <u>The Board Acted Within Its Authority In Executing an Employment Contract with Dr. Breuder That Included a Term Exceeding the Term of the Board.</u>

The Board contends that Dr. Breuder's Employment Contract is void *ab initio* because it exceeded the term of the board that executed the contract. According to the Board, Illinois common law prohibits any and all governmental boards whose members serve limited terms from executing contracts "to employ persons for terms greater than the period for which the board making the decision has left to serve." Mot. at 5 (quotations omitted). Notably, however, the Board cites no authority (nor can it) supporting its position that this common law principle, first recognized in *Milliken v. Edgar Cty.,* 32 N.E 493 (Ill. 1892), applies to a community college board's contracting powers under Sections 3-26 and 3-32 of the Act.[3] It does not, nor has it ever.

The history of public education law reveals that the common law principle relied upon by the Board has been long abandoned with respect to certain educational employment contracts, namely teacher, principal, and superintendent contracts. In fact, that principle has not been recognized as applicable to such contracts since at least 1927. In 1927, the Illinois General Assembly enacted a law that gave public school boards the power to execute employment contracts with "all teachers, principals and superintendents" for up to three years following a two-year probationary period. *See Sloan v. Sch. Directors of Dist. No. 22*, 26 N.E.2d 846, 847 (Ill. 1940); *see also Hostrop*, 523 F.2d at 574. That law was expanded to junior colleges in 1937 when the General Assembly passed the first Junior Colleges Act, which provided for the development of the junior college system as a

---

[3] Not a single case cited by the Board relates to a high-level administrator or president contract executed by a community college board pursuant to the Act. *See* Mot. at 5-6 (citing *Milliken,* 32 N.E 493 (applied to county board of supervisors regarding contract for keeper of a poorhouse); *Trombetta v. Bd. of Educ., Proviso Twp. High Sch. Dist. 209*, No. 02-C-5895, 2003 WL 1193337 (N.D. Ill. Mar. 13, 2003) (applied to contract for a building manager executed by school district organized under Illinois School Code); *Grassini v. DuPage Twp.*, 665 N.E.2d 860 (Ill. App. Ct. 1996) (applied to township with respect to township administrator contract); *Cannizzo v. Berwyn Twp. 708 Cmty. Mental Health Bd.,* 741 N.E.2d 1067 (Ill. App. Ct. 2000) (applied to township community mental health board regarding executive director contract); *Walters v. Village of Colfax*, 466 F. Supp. 2d 1046 (C.D. Ill. 2006) (applied to village concerning police chief contract)).

part of the public school system. *See* Ill. Rev. Stat. 1937, ch. 122, § 99.1 *et seq.*

The 1927 law abrogated the former common law principle that a school board could not execute a contract with a teacher or other administrator for a period exceeding the school year, which at that time was equal to the term of the school board. *See Stevenson v. Sch. Directors of Dist. No. 1*, 87 Ill. 255, 259 (Ill. 1877), *abrogation recognized by Sloan,* 26 N.E.2d at 847; *Davis v. School Directors*, 92 Ill. 293 (Ill. 1879), *abrogation recognized by Sloan,* 26 N.E.2d at 847.[4] The abrogation of the former common law rule established in *Stevenson* and *Davis* was deemed important and necessary to the advancement of public education in Illinois. Indeed, following the enactment of the 1927 law, the Illinois Supreme Court emphasized the diminished precedential value of *Stevenson* and *Davis*, stating:

> The purpose of the General Assembly in enacting the [1927 law] is apparent, for it is in the best interests of the schools that competent and capable teachers be continued in their employment. It adds to the stability of the employment and works to the advantages not only of the public but to the teachers and those employed with the administration of school affairs.

*Pack v. Sporleder*, 67 N.E.2d 198, 203 (Ill. 1946).

Since 1927, "beyond term" tenure laws relating to teacher, principal, and superintendent contracts have continued to expand. In 1969, the General Assembly expanded the 1927 law to allow school boards to contract with teachers for "continued services." *See Hostrop*, 523 F.2d at 575 (citing Ill. Rev. Stat. 1969, ch. 122, ¶ 24-11). Separate tenure laws were enacted for superintendents and principals. *See* Ill. Rev. Stat. 1969, ch. 122, ¶ 23.8; Ill. Rev. Stat. 1973, ch. 122, ¶ 23.8a. Amended versions of each of these laws still exist in the Illinois School Code. 105 ILCS 5/24-11 (2014) (allowing "contractual continued services" for teachers); 105 ILCS 5/10-23.8, 23.8a (2011) (allowing five-year performance-based contracts for superintendents and principals).

While the Illinois School Code is not applicable to the Act, *see Steinmetz*, 385 N.E.2d at 748, the Seventh Circuit has recognized that "it was against the backdrop of [these early tenure laws] that

---

[4] *Milliken* cited both *Stevenson* and *Davis* as authority for its decision. 32 N.E at 494. The subsequent abrogation of both *Stevenson* and *Davis* is further evidence of the inapplicability of *Milliken* and its progeny to the Act.

the Illinois General Assembly [enacted] the Public Junior College Act." *Hostrop*, 523 F.2d at 575. Using that backdrop, the Seventh Circuit has held that Sections 3-26 and 3-32 of the Act—the same sections under which Dr. Breuder's contract was executed—give community college boards broad authority to execute multi-year contracts with teachers and administrative personnel, including the college president. *Id.* Specifically, the Seventh Circuit determined in *Hostrop* that:

> Rather than determining the tenure policy for the junior colleges, as it had done for the public schools, the General Assembly provided that the board itself, which appoints the chief administrative officer, Id. s 103-26, should "establish tenure policies for the employment of teachers and administrative personnel," Id. s 103-32. We think that the General Assembly intended, in using this language, not to reinstate for junior colleges the rule of the Stevenson and Davis cases, but to give the board authority to establish its own policies with respect to tenure, which in its broadest sense includes the limited tenure afforded by a contract . . . .

*Id.* As such, the Seventh Circuit upheld the multi-year presidential contract at issue in *Hostrop* and determined that it provided the president a property interest in his continued employment. *Id.*

Since the Seventh Circuit's decision in *Hostrop*, federal courts considering presidential contracts executed under the Act have continued to hold that community college presidents have enforceable property rights in multi-year employment contracts, even where those contracts extend beyond the remaining term of the contracting community college board. In *Catanzaro v. Bd. of Trustees of Cmty. Coll. Dist. No. 504, Cty. of Cook, State of Illinois*, No. 90 C 2303, 1990 WL 77893, at *2 (N.D. Ill. May 21, 1990), this District held that "[p]laintiff's employment contract gives him a property interest in continuing to be Triton's president . . . until he is lawfully terminated." Catanzaro's contract was executed on January 21, 1987, and he still was serving under that contract when he was terminated on April 3, 1990. *Id.* In *Bakalis v. Bd. Of Trustees of Cmty. Coll. Dist. No. 504, Cty. Of Cook, State of Illinois*, No. 93 C 0483, 1993 WL 528084, at *3 (N.D. Ill. Dec. 17, 1993), *aff'd sub nom Bakalis v. Golembeski*, 35 F.3d 318 (7th Cir. 1994), this District again held that "[p]laintiff's employment contract gives him a property interest in continuing to be employed as the President of Triton College." Bakalis' contract provided for his continuous employment as president of Triton College

for nearly four years, from October 25, 1990 to June 30, 1994. *Id.* at *1.

The rationale adopted in *Hostrop*, and subsequently followed in *Catanzaro* and *Bakalis*, is consistent with the language of the Act, *see supra* Section I.A.1, and is controlling on this Court, *see Davis v. Jewish Vocational Serv.*, No. 07 C 4735, 2010 WL 1172537, at *6 (N.D. Ill. Mar.17, 2010) ("In the absence of a superseding decision by the Illinois Supreme Court, this Court is bound by Seventh Circuit precedent."). The Board has not presented any authority superseding the Seventh Circuit's analysis in *Hostrop* or otherwise indicating that the Illinois General Assembly intended to step back in time to the days of *Stevenson*, *Davis*, and *Milliken* when it enacted the Act. The reason is that no such authority exists. In fact, the General Assembly recently passed an amendment to the Act that irrefutably confirms that the intent behind the Act, from the date of its enactment in 1965 until the passage of this recent amendment, was to allow community college boards broad authority to execute multi-year employment contracts—just as the Seventh Circuit determined in *Hostrop*.[5]

On September 22, 2015, the General Assembly passed Public Act 99-482, which is now codified as Section 3-65 of the Act. 110 ILCS 805/3-65 (2015). Section 3-65 requires, among other things, that any employment agreement executed under the Act "after the effective date" of the amendment "may not exceed" four years. The language used by the General Assembly in Section 3-65 (*i.e.,* "after the effective date" and "may not exceed") makes clear that the General Assembly was acting not to expand the former law, but to limit the law by reigning in the ability of a community college board to execute a multi-year employment contract (notably, to 2 years beyond the term of any contracting board). That fact is made further apparent by the legislative debates leading up to the passage of Section 3-65, during which the amendment's sponsor, Representative Jeanne Ives,

---

[5] Typically, the Court cannot look beyond the language of a statute in determining the legislature's intent, *Roselle Police Pension Bd. v. Vill. of Roselle*, 905 N.E.2d 831, 834 (Ill. 2009), but when differing interpretations are proffered, legislative intent must be gleaned "from the reasons for the enactment and the purposes to be thereby attained," *Verdeyen v. Board of Education*, 501 N.E.2d 937, 941 (Ill. App. Ct. 1986). "A subsequent statutory amendment may be an appropriate source to determine legislative intent." *Cordeck Sales, Inc. v. Constr. Sys., Inc.*, 887 N.E.2d 474, 498 (Ill. App. Ct. 2008).

stated that the purpose of the amendment was to "put[] in contract limitations for community college folks" because "currently there is no limitation on straight contract . . . ." (Ex. A.2, 04/24/2015 99th Gen. Assemb. Tr., at 2:7-8, 2:17-20.)[6]

In light of the amendment and the history underlying the Act, there can be no argument that the General Assembly ever intended (even now) that the common law principle recognized in *Milliken*, and cited by the Board, applied to a community college board's contracting powers under the Act. Rather, the intent behind the Act always was to grant community college boards broad authority to execute employment contracts under Sections 3-26 and 3-32 of the Act, including multi-year contracts that extended beyond the term of the contracting board. It is only now, after the passage of Section 3-65, that the General Assembly has placed any prospective limitation on a community college board's contracting authority under these sections of the Act. Accordingly, *Milliken* and its progeny did not (and do not now) apply to the Act, and just like the presidents in *Hostrop*, *Catanzaro*, and *Bakalis*, Dr. Breuder had a protectable property interest in his Employment Contract. *Hostrop,* 523 F.2d at 575; *Catanzaro,* 1990 WL 77893, at *2; *Bakalis,* 1993 WL 528084, at *3.

### 3. The Employment Contract Does Not Conflict with Section 3-9 of the Act.

The Board also claims that Dr. Breuder's Employment Contract is void *ab initio* because Section G.3 of the Contract overrides Section 3-9 of the Act. Section 3-9 states, in part: "A majority of full voting membership of the Board shall constitute a quorum. . . . When a vote is taken upon any measure before the Board, a quorum being present, a majority of the members voting on the measure shall determine the outcome thereof." 110 ILCS 805/3-9. The Board argues that this section mandates that all decisions of the Board, including decisions relating to employment matters, be made by a simple majority vote (in some cases as few as three votes). That interpretation, however, is not consistent with Sections 3-32 and 3-42 of the Act.

---

[6] The Court can take judicial notice of the debates. *Perkins v. Linkedin Corp.,* 53 F. Supp. 3d 1222, 1241 (N.D. Cal. 2014); *Fleet Bank v. Burke*, 23 F. Supp. 2d 196, 202 (D. Conn.), *vacated on other grounds*, 160 F.3d 883 (2d Cir. 1998).

In interpreting a statute, the Court must consider the statue "as a whole, with each provision construed in connection with every other section." *Roselle Police Pension Bd.*, 905 N.E.2d at 834. As discussed above, Sections 3-32 and 3-42 of the Act grant community college boards broad authority to set their own policies regarding the employment of teachers, administrative personnel (including the chief administrative officer), and other employees. *See supra* Section I.A.1. That authority applies to policies relating to the dismissal and causes for removal of college personnel, 110 ILCS 805/3-32, 3-42, and includes the ability to set such policies by contract, *Hostrop,* 523 F.2d at 575, *see also* 110 ILCS 805/3-30. The power to set policies relating to the termination of college personnel necessarily includes the power to define and limit a board's ability to terminate an employee, including by restricting terminations to "just cause," requiring hearings or other proceedings prior to termination, and authorizing the president to make decisions regarding the firing of college personnel, etc.[7]

It is worth repeating that it was against the backdrop of expanding protections for continued employment of educational personnel that the Illinois General Assembly enacted the Act. *Hostrop*, 523 F.2d at 575; *see also supra* Section I.A.2. As the Illinois Supreme Court noted nearly 20 years prior to the Act, "it is in the best interests of the schools that competent and capable teachers be continued in their employment." *Sporleder*, 67 N.E.2d at 203. Policies that safeguard the right to continued employment "add[] to the stability of the employment and work[] to the advantages not only of the public but to the teachers and those employed with the administration of school affairs." *Id.* With this context, the intent of Sections 3-32 and 3-42 is clear: community college boards have broad discretion to determine the processes by which an employee can be terminated. *C.f. Hostrop*, 523 F.2d at 575. That discretion includes the ability to adopt a policy or execute a contract that prevents a board from terminating an employee absent "just cause" and, as here, absent a determination by a supermajority of the board that "just cause" exists. Accordingly, the Board did

---

[7] Board policies relating to the dismissal of certain classes of employees incorporate each of these limitations. *See, e.g., infra* at Section I.B. (policies cited); Cmplt. Ex. C.

not violate Section 3-9 of the Act by agreeing to Section G.3 of the Employment Contract.

In any event, the Board's argument that Section G.3 of the Employment Contract conflicts with Section 3-9 of the Act because it requires a "supermajority" vote to terminate misses the mark. The decision of a community college board to comply with the express terms of an employment contract, including the termination provisions of the contract, is not a "measure" as contemplated by Section 3-9 of the Act. Rather, the initial decision of the community college board to enter into an employment contract constitutes the "measure" that must be adopted in accordance with Section 3-9. The specific terms of any employment contract so adopted are merely part of that "measure." Any other interpretation of Section 3-9 renders an absurd result. Indeed, if the Board's argument is followed to its logical end, it would mean that any action taken by a community college board on any properly executed employment contract must occur not in accordance with the terms of that contract, but rather by a vote taken pursuant to Section 3-9. By that logic, a community college board would never truly be bound by the terms of a contract, and the authority granted a community college board under Sections 3-32 and 3-42 of the Act to limit or restrict its ability to terminate an employee by policy or contract would become meaningless.

The Board's other specific examples of how Section G.3 of the Employment Contract allegedly violates Section 3-9 of the Act only further highlight the absurdity of the Board's position:

First, the Board argues that Section G.3 violates Section 3-9 because it "grant[s] Plaintiff the right to mandate the presence of all seven Board members at a termination hearing." Mot. at 8. That interpretation blatantly misconstrues the express language of Section G.3, which merely grants Dr. Breuder the right to appear before all members of the Board, after he has been provided notice that cause for termination exists, to discuss the breaches asserted against him and an opportunity to cure. Cmplt. Ex. A § G.3 ("Upon the President's receipt of written notice from Board pursuant to Section G.1(f), the President has the right to appear before all seven (7) members of the Board, at a meeting

conducted in executive session, to discuss the breach asserted by the Board and its cure."). Nothing in the Act, including Section 3-9, prohibits a community college board from agreeing to provide the college president the right to meet with the full board prior to a termination decision.

Second, the Board argues that Section G.3 of the Employment Contract conflicts with Section 3-9 of the Act because it "grants a single trustee the power to prevent termination." Mot. at 8. The Board fails to appreciate, however, that the Act enables the same result. Section 3-9, as the Board admits, allows for measures to be passed by as few as three votes with a quorum of only four trustees. *See* 110 ILCS 805/3-32; *see also* Mot. at 8. That means that if only four trustees attend the meeting on the president's termination, one trustee potentially holds unequal voting power to cause or frustrate the termination. This leads to a very important point: Section G.3 of the Employment Contract acts as a security to both Dr. Breuder and the Board that the Board will not make an arbitrary, capricious, or unreasonable decision with respect to Dr. Breuder's right to employment under his contract. In other words, Section G.3 ensures that the Board will not deprive Dr. Breuder of his substantive due process rights in violation of the Fourteenth Amendment. *See Kaufman v. Bd. of Trustees, Cmty. Coll. Dist. No. 508*, 552 F. Supp. 1143, 1153 (N.D. Ill. 1982) ("the due process clause embodies both procedural safeguards against state infringement upon life, liberty and property as well as more substantive protections against the arbitrary and capricious disregard of those rights by the state"). Nothing in the Act prohibits the Board from constraining its ability to violate the law, or better yet, to affirmatively comply with the law. Accordingly, Section G.3 of the Employment Contract does not conflict with Section 3-9, or any other provision, of the Act.[8]

    4.  The Employment Contract Does Not Violate the Open Meetings Act.

The Board's final basis for claiming that the Employment Contract is void *ab initio* is that it violates the OMA. While the OMA prohibits the Board from taking any "final action" in a non-

---

[8] If there is doubt as to whether a conflict exists, that doubt cannot be resolved on a motion to dismiss. *See Nathan v. Morgan Stanley,* No. 11 C 2231, 2012 WL 1886440, at *12 (N.D. Ill. May 22, 2012) (internal citation omitted).

public meeting, 5 ILCS 120/2(e), actions that violate the OMA are not void *ab initio* but merely voidable, *see Bd. of Educ. Sch. Dist. No. 67 v. Sikorski*, 574 N.E.2d 736, 740 (Ill. App. Ct. 1991), *see also* 5 ILCS 120(3)(c) (listing remedies for violation of OMA). When an action violates the OMA, "the trial court is not required to declare a final action null and void, but is permitted to choose an appropriate remedy that satisfies orderly administration and the public interest, as well . . . as the interests of the parties . . . ." *Sikorski*, 574 N.E.2d at 740 (quotations omitted) Generally, where a contract term is voidable, the appropriate remedy is to sever the voidable provision (here, Section F) to give effect to the intentions of the parties and the purpose of the contract. *See VG Marina Mgmt. Corp. v. Wiener*, 882 N.E.2d 196, 204 (Ill. App. Ct. 2008). That result, however, is not necessary here, because Section F of the Employment Contract was superseded by the January 2015 Agreement, which provided that Dr. Breuder's employment with COD would end and not extend beyond March 31, 2016. *See* Cmplt. Ex. B ¶ 4. Accordingly, the Board's argument that Section F renders the Employment Contract void is moot.

Nevertheless, the Board's specific arguments should be addressed. The Board posits two arguments in support of its assertion that Section F violates the OMA. The first is that Section F allowed "Plaintiff and the board Chairperson, acting alone, [to] extend the President's contract for a year without further board involvement or taking such action in a public forum." Mot. at 8. The second is that Section F "obligated the board to vote on termination notices exclusively during closed sessions." *Id.* Both positions greatly misconstrue Section F.

First, Section F does not allow the President and the Board Chairperson, acting alone, to extend the contract. Section F provides only that the President remind the Chairperson of the Board's obligation to notify the President if it intends to terminate the contract at the end of its existing term. Cmplt. Ex. A § F ("The President will notify in writing the Chairperson of the Board by February 1 of each such year that failure of the Board to give the President notice of intent not to

12

extend the Agreement will extend this Agreement one (1) additional year."). The Board's contention that this provision allows the President and the Chairperson to conspire to extend the contract absent Board involvement is unavailing and absurd. The Court should not presume an improper purpose and should interpret a contract with an eye toward enforceability.

Second, nothing in Section F requires the Board to take any "final action" in a closed meeting. As Section F makes clear, it is only in the event that neither party notifies the other of its intent to terminate the contract at the end of its term that a "final action" (*i.e.*, extension) might occur outside of a public meeting. *See generally* Cmplt. Ex. A § F. Such action-by-inaction, however, is not mandated nor is it incurable. Section F gives the Board the opportunity to avoid an automatic extension by notifying the President of its intention not to extend the contract. Presumably, if the Board has failed to provide such notice, it is because the Board wanted to extend the contract. In accordance with Illinois law, the Board could then ratify its decision during a public meeting. *See Sikorski*, 574 N.E.2d at 740. Nothing in Section F prevents the Board from taking this action. Thus, Section F does not violate the OMA and does not render the contract void.

### B. The Board's Policies Provided Dr. Breuder a Protectable Property Interest In His Continued Employment as the College President.

A protectable property interest in employment can be established in an employer's policies and procedures if those policies and procedures set forth "a clearly implied promise of continued employment." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see also Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987). Policy No. 15-275 provides such a promise by restricting the circumstances under which an administrator's employment can be unilaterally terminated. *See* Cmplt. Ex. C; *see also Duldulao*, 505 N.E.2d at 318. The Board argues that Policy No. 15-275 did not provide Dr. Breuder a protectable property interest in his employment because the policy does not apply to the president. The Board's argument directly contradicts its actions with respect to Dr. Breuder's termination.

As alleged in the Complaint, the Board relied upon Policy No. 15-275, as well as Policy No. 15-251, in fashioning its bogus "termination proceedings" against Dr. Breuder. Cmplt. ¶¶ 76, 85-88, 91-100. The Complaint alleges that the Board spent nearly six months searching for and fabricating "causes" to terminate Dr. Breuder, and that in the midst of that investigation (clearly in anticipation of Dr. Breuder's termination), the Board appointed a Hearing Officer to oversee "administrator appeals" requested under Policy No. 15-251. *Id.* If, as the Board contends, Dr. Breuder's Employment Contract was void *ab initio*, making him an employee at-will, the Board would not need "cause" for his termination nor would he be allowed an appeal—*unless* Policy No. 15-275 provided Dr. Breuder a right to be free from termination without cause. The Board's conduct clearly indicates (or at least presents a factual question) that Policy No. 15-275 applies to the President.

Furthermore, the Board's argument that Dr. Breuder has waived his rights under Policy No. 15-275 by failing to seek an appeal under Policy No. 15-251 also is unavailing. The Complaint alleges a number of facts demonstrating that any appeal under Board polices would have been fruitless, if not outright denied. *See infra* Section III. Under the circumstances, Dr. Breuder was not obligated to request an appeal under Policy No. 15-251. *See infra* at 18 n.14, n.15 (cases cited).

## II. COUNT II ALLEGES AN ACTIONABLE DUE PROCESS CLAIM BASED ON THE BOARD'S INFRINGEMENT OF DR. BREUDER'S PROTECTED LIBERTY INTERESTS

Count II alleges that the Board has deprived Dr. Breuder of his Fourteenth Amendment right to occupational liberty without due process of the law. The Board argues that the Complaint fails to state such a claim because Dr. Breuder does not have an actionable claim for common law defamation, specifically because Dr. Breuder is a "public figure" and the Board otherwise is immune to liability based on individual trustee's tortious conduct. These arguments fail for several reasons.

First, the Board's assertion that a federal constitutional liberty interest claim depends on an *actionable* common law defamation claim is not correct. While a federal liberty interest claim does "require[] the employee to show that a public official made defamatory statements about him" that

14

were "false assertions of fact," *Strasburger v. Bd. of Educ., Hardin Cty. Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998), that requirement does not somehow make a federal liberty interest claim and a state law defamation claim one and the same. "It is blackletter law that 'the elements of, and the defenses to, a federal cause of action are defined by federal law.'" *Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519, 530 (7th Cir. 2011), *partially vacated on other grounds sub nom.* 649 F.3d 799 (7th Cir. 2011) and 651 F.3d 722 (7th Cir. 2011). A review of federal cases reveals no case that holds or even suggests that a federal liberty interest claim rises and falls with a state law defamation claim[9]— and the Board cites to no such case.

Second, the "public figure" defense raised by the Board, which was first considered in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), has been consistently rejected as a legal defense to constitutional liberty interest claims. In *Baden vs. Koch*, the Southern District of New York declined to apply *Sullivan* to a liberty interest claim because "[n]o Supreme Court or lower court case analyzing liberty interest claims [has held] or even suggest[ed] that Sullivan limits or affects the liability for compensatory damages of a public employer who thus violates the constitutional rights of an employee." 1984 WL 664 at *3. Similarly, the District Court of Kansas rejected the argument that a plaintiff pursuing a liberty interest claim must prove that a public official acted with malice, an element required by *Sullivan* to defeat the "public figure" defense. *Warren,* 207 F. Supp. 2d at 1222. The Seventh Circuit echoed that reasoning when it recognized that proof of malice is not required to prevail on a constitutional liberty interest claim. *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1032 (7th Cir. 1992). As these cases reveal, the Board's assertion that a "public figure" cannot assert a liberty

---

[9] Indeed, the two claims are distinct. *Baden vs. Koch*, No. 79 CIV. 4296-CSH, 1984 WL 664, at *3 (S.D.N.Y. July 25, 1984) (a federal liberty interest claim "springs from quite different roots" than a common law defamation claim); *see also Caffarello v. Illinois State Toll Highway Auth.*, No. 13 C 8495, 2014 WL 3559388, at *8 (N.D. Ill. July 17, 2014) ("It is well-settled that the interest protected by a constitutional liberty interest claim is occupational liberty rather than reputation otherwise, defamation by a public official would be a federal tort, which no one believes.") (quotation omitted); *Warren v. City of Junction City, Kansas*, 207 F. Supp. 2d 1216, 1222 (D. Kan. 2002) ("plaintiff's liberty interest claim involves interests distinct from a state law defamation claim").

interest claim against his public employer is incorrect. Again, the Board has not cited a single case in which the "public figure" defense is applied (or even asserted) against a liberty interest claim.[10]

Third, the Board's assertion that it is entitled to the same common law immunities and privileges as its individual trustees contradicts federal law. When a local government entity is sued under 42 U.S.C. § 1983, the entity is not entitled to any absolute or qualified immunities—even if the officials employed by the entity are so entitled. *Capra v. Cook Cty. Bd. of Review*, 733 F.3d 705, 711 (7th Cir. 2013); *Hernandez v. Sheahan,* 455 F.3d 772 (7th Cir. 2006); *see also Owen v. City of Independence,* 445 U.S. 622, 638 (1980) (holding that municipalities do not enjoy qualified immunity for good-faith constitutional violations by their officials).[11]

Fourth, the Illinois Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-201) does not apply to Dr. Breuder's federal due process claims. *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 618 (7th Cir. 2001) (holding that Tort Immunity Act did not apply to federal constitutional claims brought under § 1983); *Collins v. Bd. Of Educ. Of North Chi. Cmty. Unit Sch.*, 792 F.Supp.2d 992 (N.D. Ill. 2011) (same); *Anderson v. Village of Forest Park*, 238 Ill.App.3d 83, 179 Ill.Dec. 373, 606 N.E.2d 205, 211-12 (1st Dist. 1992) (holding that the Tort Immunity Act does not apply to § 1983 claims because of the Supremacy Clause).

Since the Board has articulated no other basis to dismiss Dr. Breuder's liberty interest claim other than the defenses refuted above, the Board's motion on Count II should be denied.

### III. THE COMPLAINT ADEQUATELY ALLEGES THAT THE BOARD FAILED TO PROVIDE DR. BREUDER SUFFICIENT PROCESS WHEN TERMINATING HIS EMPLOYMENT

In its final attempt to avoid Dr. Breuder's due process claims, the Board argues that Dr.

---

[10] Even if the defense applies, it yields where the defendant acted with malice. *Sullivan*, 376 U.S. at 279-80. Actual malice has been sufficiently pled here. *See* Opp. to Defs' Mtn. to Dismiss, filed herewith, at Sec. IV.A.3.

[11] Even if a public official's immunities and privileges extended to the public entity, the Board still would not be immune based on the state privileges and immunities cited by the Board. Under the Supremacy Clause, a defendant cannot insulate himself from liability for a federal violation under state law doctrines. *Owens v. Benigni*, 1989 WL 24096, at *1 (N.D. Ill. Mar. 14, 1989); *see also Sebesta v. Davis*, 2013 WL 5408796, at *2 (N.D. Ill. Sept. 26, 2013).

Breuder was offered sufficient due process, but that he refused to avail himself of that process. This argument is plainly contradicted by the allegations set forth in the Complaint. As the allegations and attached exhibits make clear, the "process" that was offered to Dr. Breuder could not have been more contrived. For example, the Complaint alleges:

- On April 30, 2015, following nearly a year of public slander generated by Trustee Hamilton and newly-elected Trustees Mazzochi, Napolitano, and Bernstein, the Board placed Dr. Breuder on forced administrative leave. Dr. Breuder was not provided sufficient notice or given an opportunity to object or respond.
- For the next six months, the Board conducted an "investigation" aimed at finding "causes" for Dr. Breuder's dismissal—an outcome that Defendants Hamilton, Mazzochi, Napolitano, and Bernstein had already made clear would result.
- On September 17, 2015, the Board declared Dr. Breuder's contract void *ab initio*. Again, he was given no notice or opportunity to object or respond.
- On August 27, 2015, the Board sent Dr. Breuder a package of loose documents with a request to have Dr. Breuder meet with the Board's attorneys the following week. Dr. Breuder replied he could not meet until a later date. The Board never responded.
- On September 24, 2015, the Board sent Dr. Breuder a list of "charges" and informed him that a termination hearing would be held. Dr. Breuder timely responded and objected to the Board's actions. Yet, Dr. Breuder made clear that he was willing to participate in a hearing so long as the hearing provided basic due process safeguards.
- On October 1, 2015, the Board responded that Dr. Breuder was not entitled to due process, but that he could provide a written response to the Board's charges.
- Between October 1 and October 16, 2015, Dr. Breuder continued to request an impartial due process hearing. The Board ignored each of these requests.
- On October 16, 2015, just hours after receiving another request from Dr. Breuder for a hearing, the Board posted a notice of special meeting to take place on October 20, 2015, to vote on Dr. Breuder's termination.

*See* Cmplt. ¶¶ 58, 60, 67, 70-77, 81, 84, 90-105, and exhibits incorporated therein. These facts make clear that the Board refused to provide Dr. Breuder adequate due process.

As the Board concedes, the only "process" it ever provided Dr. Breuder was an opportunity to provide a written response to the Board's charges.[12] A written response does not come close to the most basic pre-termination hearing required by the Fourteenth Amendment. The sufficiency of process depends on whether adequate post-termination proceedings are available. *Carmody v. Bd. of*

---

[12] The Board's due process violations are not limited to the termination itself. The Complaint also alleges violations regarding the Board's actions in placing Dr. Breuder on forced administrative leave and in voiding his contracts.

*Trustees of Univ. of Ill.*, 747 F.3d 470, 474-75 (7th Cir. 2014); *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. 205*, 389 F.3d 685, 690-91 (7th Cir. 2004); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985). For Dr. Breuder, no adequate post-termination proceedings exist, as his only state post-termination remedy is a breach of contract action.[13] The Seventh Circuit has been clear that a post-termination breach of contract action does not constitute adequate process. *Baird*, 389 F.3d at 693. Where an adequate post-termination hearing does not exist, the pre-termination hearing offered must be more robust, providing the employee "trial like" rights. *Id.* at 692. Thus, under the circumstances, the Board's offer to Dr. Breuder to respond to the Board's charges by written letter was not adequate process, and Dr. Breuder's due process claims should not be dismissed based on the Board's "offer" of process.[14] *See id.*; *Washington v. Burley*, 930 F. Supp. 2d 790, 803 (S.D. Tex. 2013) (denying summary judgment where question of fact existed as to whether written response to charges was sufficient to satisfy pre-termination due process).

## IV.    COUNT IV SETS FORTH AN ACTIONABLE BREACH OF CONTRACT CLAIM

The Board's argument that Count IV fails to state a claim is based entirely on its assertion that the Employment Contract and the January 2015 Agreement are void *ab initio*. As set forth in Section I, *supra*, the contracts are valid and enforceable. Thus, there is no basis to dismiss Count IV.

---

[13] Dr. Breuder, unlike many public employees, is not subject to the Illinois Administrative Review Act. 110 ILCS 805/3B-6 (permitting review of terminations under Administrative Review Law for "Tenured Faculty" only). The Board has argued that Dr. Breuder could have sought a post-termination proceeding under Board Policy No. 15-251. However, the Board's actions leading up to Dr. Breuder's termination, as well as the Board's argument to this Court that the policy did not apply to Dr. Breuder, make clear that an appeal under Policy No. 15-251 would not have been made available to Dr. Breuder. Dr. Breuder was not required to pursue an internal post-termination hearing that would be denied or frustrated by the Board's actions. *See All EMS Inc. v. 7-Eleven Inc.*, 181 F. App'x 551, 555-56 (7th Cir. 2006) (party to contract excused from performance where it is shown that other party hindered, frustrated, or prevented performance); *Baird*, 389 F.3d at 695-96 (failure to partake in pre-termination hearing did not waive due process rights where adequacy of hearing was frustrated by defendants' conduct).

[14] In addition to the utter lack of process, it is preposterous for the Board to assert that Dr. Breuder was required to presume that the Board was impartial. Under the circumstances, Dr. Breuder had no obligation to submit himself to the "process" that the Board provided. *See Baird*, 389 F.3d at 695-96 ("We believe the *presumption* of fairness continues and the plaintiff bears the risk of waiver, but under the present facts, when the plaintiff has requested reasonable safeguards and has been flatly denied both before and at the hearing and where nothing useful could apparently be gained by continuing participation, we will not find a waiver as a matter of law.")

WHEREFORE Plaintiff respectfully requests that the Court deny the Board's Motion to Dismiss Counts I, II, and IV.


Dated: February 16, 2016

Respectfully submitted,

/s/ Melissa N. Eubanks_____
James R. Figliulo
Melissa N. Eubanks
FIGLIULO & SILVERMAN, P.C.
10 S. LaSalle Street, Suite 3600
Chicago, IL 60603
(312) 251-4600
*Attorneys for Plaintiff*

Martin A. Dolan
DOLAN LAW, P.C.
10 S. LaSalle Street, Suite 3702
Chicago, Illinois 60603
Phone: 312-676-7600
*Attorney for Plaintiff*

Terry A. Ekl
EKL, WILLIAMS & PROVENZALE LLC
Two Arboretum Lakes
901 Warrenville Road, Suite 175
Lisle, IL 60532
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

Melissa N. Eubanks, an attorney, states that a copy of the attached

## PLAINTIFF ROBERT L. BREUDER'S OPPOSITION TO DEFENDANT BOARD OF TRUSTEES' MOTION TO DISMISS COUNTS I, II, AND IV OF THE COMPLAINT

will be caused to be served upon all counsel of record via electronic notification by the United States District Court's ECF System on February 16, 2016.

_/s/ Melissa N. Eubanks