**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT BREUDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15 CV 9323** |
| | ) | |
| **v.** | ) | **Judge Andrea R. Wood** |
| | ) | |
| **BOARD OF TRUSTEES OF** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **COMMUNITY COLLEGE DISTRICT** | ) | |
| **NO. 502, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons set forth below, plaintiff Robert Breuder's motion to compel defendants

Kathy Hamilton and the Board of Trustees of Community College District No. 502 (the "Board")

to produce withheld communications involving Christopher Robling (Dckt. #370) is granted in

part and denied without prejudice in part.

I.       **BACKGROUND**

A.       **Procedural Background**

Plaintiff, who served as the President of the College of DuPage (the "College") from

2009 until his termination in October 2015, brings this lawsuit against the Board[1] and former

Board members, Kathy Hamilton, Deanne Mazzochi, Frank Napolitano, and Charles Bernstein,

alleging claims concerning §1983 due process violations, breach of contract, defamation, and

civil conspiracy.  Certain defendants have, in turn, filed counterclaims against Breuder alleging

breach of contract, breach of fiduciary duty, and conversion.

---

[1] Generally speaking, the Court refers to defendant as "the Board," but when describing individuals,
events, and facts related to the College as an entity might refer to "the College."  At times, the two are
used interchangeably.

1

Before the Court is Breuder's motion to compel defendant Hamilton and the Board to produce withheld communications involving Christopher Robling. (Dckt. #370). In short, and as explained in significant detail below, Robling is a public relations consultant who provided services to both Hamilton and the Board in 2014 and 2015. Defendant Hamilton has asserted the attorney-client privilege over twenty-four e-mails involving Robling and the Board has asserted the attorney-client privilege over 550 records involving Robling.[2] In the instant motion, Breuder argues, for various reasons, that the attorney-client privilege does not extend to the withheld Robling communications with respect to Hamilton or the Board.[3] For their part, Hamilton and the Board dispute Breuder's assertion of facts regarding Robling's roles and continue to assert the privilege over the documents at issue.

### B. Robling's Relationship With Hamilton

Robling is a public relations and communications consultant. In August 2014, defendant Hamilton (then a College Board member) executed an agreement in her individual capacity with Robling's consulting company, Clearspan Strategic LLC ("Clearspan"), effective August 4, 2014

---

[2] The twenty-four e-mails withheld by Hamilton were transmitted between August 25, 2014 and March 4, 2015 and are highlighted on a copy of Hamilton's second amended privilege log attached as Exhibit 1 to Breuder's brief. (Dckt. #371-1.) The Board's withheld documents are reflected in various versions of the Board's privilege log, but plaintiff has conveniently segregated the documents into a separate log attached as Exhibit 2 to his brief. (Dckt. #374.) Plaintiff counted 558 documents and the Board counted 556 documents.

[3] Breuder apparently disputes the Board's work product assertion over 17 documents as well but does not provide any argument on this point. (Dckt. #371 at 3, n.2). Accordingly, the Court makes no finding as to the Board's work product designations and presumes those designations were made in good faith. Plaintiff also disputes whether "the withheld Robling communications relate to truly privileged matters," as opposed to "non-privileged political and public relations advice." (*Id*. at 3, n.3.) However, as Breuder acknowledges, that argument overlaps with issues raised in Breuder's separate motion to compel regarding the Board's privilege log. (Dckt. #420). The Court will address that motion and the issues therein by separate order in due course. As such, this order relates solely to whether the attorney-client privilege even extends to Robling given his various roles with Hamilton and the Board and not whether the communications at issue meet the definition of privileged information.

to December 31, 2014 (hereinafter, the "Agreement"). (Dckt. #375.) Under the terms of the Agreement, Clearspan – and in turn Robling – agreed to provide Hamilton with the following services: (1) a communications plan, to be agreed to by Hamilton and Clearspan; (2) written material that identifies Hamilton and her volunteer civil work; (3) introductions to press covering post-secondary education in Chicagoland; and (4) communications consultation. (Dckt. #375 at 1.) Robling further agreed to "maintain ongoing communications with Ms. Hamilton" and "report on activities to achieve goals of the agreed-to communications plan regularly." (*Id*.) In exchange for these services, Hamilton agreed to pay Robling $2,500 a month. (*Id*.)

Robling has submitted an affidavit providing further details about his work for Hamilton and the Board. (Dckt. #371-3.) According to Robling, Hamilton retained his firm in August 2014 "to work with her to provide crisis counseling regarding concerns she had detected about the College of DuPage," such as the "fraud uncovered at the College radio station, the lack of controls in place to prevent or readily detect that fraud; waste in the spending at auxiliary enterprises like the Waterleaf; [and] abuse in the awarding of contracts to 'insiders' who were on the College's Foundation Board…" (*Id*. at 2.) Hamilton and Robling apparently agreed that "the administration and her fellow trustees were attempting to silence her by censuring her for asking pointed questions and raising concerns about practices at the College." (*Id*.) Given this landscape, Robling states that he worked with Hamilton "throughout the Fall of 2014 as she became a whistleblower" concerning financial and management issues at the College. (*Id*.) Specifically, Robling maintains that he provided Hamilton with communications advice, strategic planning, tactical assistance, and "litigation consultation (in conjunction with counsel)."[4] (*Id*.) At his deposition in Hamilton's 2017 divorce proceedings, Robling provided a

---

[4] Though Robling states that he "studied law at Northwestern University School of Law," no party has asserted that he is a licensed attorney or that he himself provided legal advice to Hamilton or to the Board.

similar description of his duties while working for Hamilton. (*See* Dckt. #371-5 at 11-14 & #371-6 at 3-6 (describing his duties in assisting Hamilton with crisis and reputation management); Dckt. #386-3 (describing his initial conversations with Hamilton).)

Hamilton also explained the circumstances surrounding Robling's hiring and the services he provided in her deposition testimony during her divorce proceedings. According to Hamilton's testimony, Robling helped her "navigate" through the "crisis [she] was in" by identifying and delivering the message she needed to get out to the people of DuPage County. (Dckt. #386-2 at 5-7.) She also testified that Robling helped protect her reputation and her family's reputation in the face of the Board's censure and "lies." (*Id.*) Robling worked for Hamilton from April 2014 through December 2015. [5] Hamilton continued to compensate Robling throughout 2015, either directly or indirectly through payments to his son's university for tuition and other costs. (*See* Dckt. #371-5 at 29-34, 64-67 & #371-6 at 154-55.)

## C. Robling's Relationship With The Board

According to his affidavit, in "late 2014 or early 2015," Robling contends that he "voluntarily" began to assist Hamilton "as she helped the Clean Slate candidates – Frank Napolitano, Charles Bernstein, and Deanne Mazzochi – as they sought to become trustees of the College." (Dckt. #371-3 at 2-3.) Though Robling provided communications advice and strategic planning, he describes himself as "one of many volunteers," as opposed to their campaign manager. (*Id.* at 3.)

After Napolitano, Bernstein, and Mazzochi were elected to the Board in early April 2015, Robling states that he "assisted in the preparation for the first Board meeting" which took place

---

[5] Although the written Agreement between Hamilton and Robling extended only through December 31, 2014, Robling testified in his deposition during the divorce proceedings that he had a "contract in fact" with Hamilton after that date. (Dckt. #371-5 at 25.)

on April 30, 2015.[6]  (*Id.*)  It was at this meeting that the Board appointed Hamilton as Chairman, placed then-President Breuder on administrative leave, and appointed Joe Collins as acting Interim President.  (*See* April 30, 2015 Organizational Bd. Meeting Minutes, available at https://www.cod.edu/about/board_of_trustees/pdf-docs/minutes/2015april30min_org.pdf and April 30, 2015 Special Bd. Meeting Minutes, available at https://www.cod.edu/about/board_of_trustees/pdf-docs/minutes/2015apr30_spcl.pdf.)

Robling states generally that he "worked for the college from approximately April 2015 through mid-December 2015."  (Dckt. #371-3 at 3.)  However, the College's employment records show that it was actually on May 21, 2015 that the College hired Robling as a part-time, temporary (not to exceed one year) employee as the "Assistant to the President [Joe Collins] for Institutional and Transition Affairs."  (Dckt. #371-7 & #371-8.)  The stated function of the position was to assist the president and Board regarding institutional and transitional affairs and the duties included "participate on and provide counsel to COD Transition Team;" work with Board of Trustees as appropriate; and "other duties as assigned."  (Dckt. #371-9 at 2.)  The College agreed to pay Robling $455 per week, which Robling donated back to the College of DuPage Foundation.  (Dckt. #371-6 at 153-54 & #371-14.)

According to Robling, during the time of his employment, the College was "in crisis" for multiple reasons:  namely, the grand jury investigations surrounding Breuder, state legislative demands for audits, an audit by the Higher Learning Commission ("HLC") (the College's accrediting body), and the ongoing frustration of the public and negative media attention.  (Dckt. #371-3 at 3.)  Robling explains that this "confluence of events" touched on government relations,

---

[6] Robling stated that the meeting took place "on or about April 28, 2015," but records reveal the date was April 30, 2015.

media relations, alleged malfeasance and legal issues, all of which he had dealt with many times in his career as a consultant. (*Id*.)

Robling states that his responsibilities at the College involved helping the Board and senior leadership with strategic planning about the ongoing investigations, potential reforms, transition issues, relationships with the legislature, the presidential search, employment decisions made by the College, and media communications concerning all of these issues. (*Id*. at 3-4.) Robling states that he worked closely with interim President Collins, members of the Board, and outside counsel, and that "the senior management team and the Board sought [his] advice and relied upon [his] recommendations when making key decisions." (*Id*. at 4.) Robling explains that "[i]n many instances, counsel participated in the discussions of which [he] was a part because the College was seeking the legal advice of counsel and/or wanted to make sure that the College was considering the legal implications of events as they were occurring." (*Id*. at 5.)

Breuder, for his part, paints a far different picture of the role that Robling played with the College. In particular, he maintains that Hamilton directed Interim President Collins to create a sham position and to hire Robling so that he could continue his role as Hamilton's political and public relations advisor while ostensibly serving as a College employee. In support, Breuder attaches the report of the accrediting body, the HLC, from its July 2015 Advisory visit to the College. (Dckt #371-10.) According to interviews conducted by the HLC, Hamilton (1) "instructed [Collins] to hire an employee to report to the Acting Interim President," (2) told Collins "to hire a particular individual, Chris Robling;" and (3) further advised Collins that the "employee would work for [Hamilton]." (Dckt. #371-10 at 30-31.)

Notwithstanding the parties' dispute regarding the nature of Robling's role with the College, it is undisputed that Robling continued providing various services to Hamilton as

6

outlined in their Agreement during his employment with the College in 2015 *and* that Hamilton (as detailed above) continued to compensate Robling for the services he performed for her. Ultimately, on December 13, 2015, Hamilton resigned from the Board citing "personal reasons." (Dckt. #371-13.)  Two days later, Robling sent a resignation e-mail to President Collins ending his "temporary part time" position with the College.  (Dckt. #371-14.)

## II.    ANALYSIS

Breuder vehemently disputes Hamilton's and the Board's assertions of the attorney-client privilege over communications that include Robling.  With respect to Hamilton, Breuder argues that Hamilton's privilege does not extend to her public relations consultant Robling because she has not shown how Robling's participation in her communications with counsel was necessary to facilitate legal advice.  As for the Board, Breuder argues that Robling should not be considered an employee of the College for purposes of the attorney-client privilege because he was, in fact, *not* a College employee prior to May 21, 2015 and that, thereafter, he was an employee in name only while truly working for Hamilton.  Alternatively, even if the Court finds that Robling was an employee, Breuder argues that the Board has failed to satisfy the applicable "subject matter" test that would extend the Board's privilege to the communications to which Robling was a party.  The Court addresses each of these distinct issues in turn.

### A.    Legal Standard

The parties agree that federal law applies to the privilege issues before the Court.  *See, e.g., Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 423144, at *2 (N.D.Ill. Feb. 4, 2019) ("Federal common law governs any privilege determination in this federal question suit…even though the complaint contains supplemental state law claims.").  It is also agreed that the attorney-client privilege applies: (1) where legal advice of any kind is sought; (2) from a

professional legal adviser in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at [the client's] instance permanently protected; (7) from disclosure by himself or by the legal adviser; (8) except the protection be waived. *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983); *United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992); *Sullivan v. Alcatel-Lucent USA, Inc.*, No. 12 C 7528, 2013 WL 2637936, at *2 (N.D.Ill. June 12, 2013). "Whether the privilege exists is a fact intensive inquiry . . . , and cannot be solved by simply looking to the identity of the sender or recipient of the communication." *Motorola Sols., Inc. v. Hytera Commc'ns. Corp.*, 17 C 1973, 2018 WL 1804350, at *4 (N.D.Ill. Apr. 17, 2018) (citation omitted).

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *McCullough v. Fraternal Ord. of Police, Chicago Lodge 7*, 304 F.R.D. 232, 236 (N.D.Ill. 2014). Because "the privilege is in derogation of the search for truth," it is narrowly construed and applies "only where necessary to achieve its purpose." *United States v. BDO Seidman*, LLP, 492 F.3d 806, 815 (7th Cir. 2007) (internal quotations and citations omitted); *Lawless,* 709 F.2d at 487 (scope of the privilege should be "strictly confined within the narrowest possible limits"). The party asserting the attorney-client privilege has the burden of establishing all essential elements of the privilege and that it has not been waived. *Lawless*, 109 F.2d at 487; *Square D Co. v. E.I. Elecs., Inc.*, 264 F.R.D. 385, 390 (N.D.Ill. 2009).

**B. Hamilton Has Waived Her Attorney-Client Privilege Over The E-Mail Communications Involving Robling.**

Hamilton has withheld twenty-four e-mail communications with her attorneys (Dan Kinsella and/or Aldo Botti) that also include third-party Robling because, according to Hamilton,

the attorney-client privilege extends to Robling in his capacity as her agent/PR consultant. The twenty-four e-mail communications fall into four categories: (1) fourteen e-mails that were sent by Hamilton to counsel with Robling included as an additional recipient; (2) four e-mails that were sent by counsel to Hamilton with Robling included as an additional recipient; (3) four e-mails that were sent by Robling to counsel with Hamilton included as an additional recipient; and (4) two e-mails that were sent by Robling to counsel, period. [7]

For the reasons stated below, the Court respectfully disagrees with Hamilton's contention and finds that she has waived any attorney-client privilege that otherwise may have existed over these twenty-four e-mail communications.

"It is clearly established black letter law that a party waives the attorney-client privilege when the otherwise privileged documents are disclosed to a third party." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 335 F.R.D. 510, 514 (N.D.Ill. 2020) (internal quotation and citation omitted); *Jenkins v. Bartlett,* 487 F.3d 482, 490 (7th Cir. 2007) ("[O]rdinarily, statements made by a client to his attorney in the presence of a third party do not fall within the privilege, even when the client wishes the communication to remain confidential"); *Burden-Meeks v. Welch,* 319 F.3d 897, 899 (7th Cir. 2003) ("Knowing disclosure to a third party almost invariably surrenders the privilege with respect to the world at large; selective disclosure is not an option"). "However, there is an exception to the general rule that the presence of a third party will defeat a

---

[7] The Court notes that Hamilton has failed to make any argument as to how the two emails in the latter category that were exchanged between Robling and counsel but did *not* include Hamilton herself satisfy the test for being covered by the attorney-client privilege in the first instance. *See, e.g., Pemberton v. Republic Services, Inc.,* 308 F.R.D. 195, 202 (E.D.Mo. 2015) (communications with public relations consultant not privileged because none of the documents "actually involved communications directly between counsel and client" and "were not communications made between a client and its counsel made in confidence for the purpose of obtaining legal advice"). Nonetheless, for purposes of this motion, the Court will presume that these emails are covered by Hamilton's attorney-client privilege in the first instance.

claim of privilege when that third party is present to assist the attorney in rendering legal services" though, as the Seventh Circuit has noted, "the presence of the third person is normally unnecessary for communication between the client and h[er] attorney." *Jenkins,* 487 F.3d at 490-91; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 335 F.R.D. at 517.

Accordingly, to avoid waiver here, Hamilton – regardless of her subjective intent not to waive the privilege – must show that "statements made to [her] attorney[s] in the presence of [Robling,] a third party non-lawyer" were "necessary to the obtaining or giving of legal advice." *Motorola Sols., Inc.*, 2018 WL 1804350, at *4; *Heriot v. Byrne*, 257 F.R.D. 645, 666 (N.D.Ill. 2009) ("[T]he attorney-client privilege should be limited to instances where a third party . . . assists a lawyer in giving legal advice, and where the third party's participation was required to enable the attorney to render legal advice.") (internal quotations and citations omitted). In particular, the third party's presence must be "'necessary to clarify, facilitate, or improve an attorney's comprehension of the facts on which a legal opinion will be given or a client's comprehension of the attorney's opinion,' so that the client could 'obtain informed legal advice.'" *Flo Pac, LLC v. NuTech, LLC,* No. WDQ-09-510, 2010 WL 5125447, at *8 (D.Md. Dec. 9, 2010), *quoting* Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, at 264 (5th ed. 2007).[8] The involvement of the third party must be "nearly indispensable" or "serve some specialized purpose in facilitating the attorney-client

---

[8] The *Flo Pac* court elaborated on this point stating that "[a] third party's presence is 'necessary' when 'some arcane information must be transmitted,' and the third party acts 'as an interpreter' of a language, be the language verbal or technical." *Flo Pac*, 2010 WL 5125447, at *8, *quoting* Epstein, *supra*, at 264; *see also Universal Standard Inc. v. Target Corp.,* 331 F.R.D. 80, 87 (S.D.N.Y. 2019) ("waiver is not found where the presence of a third party is needed to allow the client to communicate information to an attorney, such as where a translator is used or where an accountant supplies specialized knowledge to allow an attorney to understand the client's situation").

communications." *Id.*; *Dublin Eye Assocs., P.C. v. Massachusetts Mut. Life Ins. Co.,* No. 5:11-CV-128-KSF, 2013 WL 653541, at *8 (E.D.Ky. Feb. 2, 2013).

The Seventh Circuit has recognized that the exception to the third-party waiver rule "applies both to agents of the attorney, such as paralegals, investigators, secretaries and members of the office staff responsible for transmitting messages between the attorney and client, and to outside experts engaged to assist the attorney in providing legal services to the client, such as accountants, interpreters or polygraph examiners." *Jenkins,* 487 F.3d at 491 (internal quotation marks omitted); *Pogorzelska v. VanderCook Coll. of Music,* No. 19 C 5683, 2021 WL 2660268, at *3 (N.D.Ill. June 29, 2021) (same, quoting *Jenkins*). This exception covers retained experts "when the expert assists the attorney by transmitting or interpreting client communications to the attorney or formulating opinions for the lawyer based on the client's communications." *Jenkins,* 487 F.3d at 491.

In this instance, Hamilton states that she retained Robling "for crisis management to protect her good reputation due to the hostile then Board of Trustees' censure of her with a pack of lies" and to identify and deliver the appropriate "message" to the people of DuPage County. (Dckt. #386 at 5 (citing Dckt. #386-2 & #386-3).) In light of this role, Hamilton maintains that Robling's inclusion in her communications with counsel was "needed to understand first-hand the legal consequences of their actions and in dealing with the hostile Board of Trustees and Dr. Breuder, and the press" and "to ensure that [Hamilton and Robling]…did not violate the censure or any law or COD policy" in their crisis management process. (Dckt. #386 at 8, 9). Hamilton further asserts in her brief – without elaboration or citation to any evidence – that the fact that she has dyslexia required Robling's presence. (Dckt. #386 at 6, 9). Even accepting these

11

assertions as true, they fall far short of establishing that the attorney-client communications that Hamilton shared with Robling fit within the exception to the third-party disclosure waiver rule.

The question is not whether Robling's presence enhanced the benefit that counsel's legal advice provided to Hamilton or whether Robling himself obtained a benefit from the legal advice. Instead, the pertinent inquiry is whether Robling was nearly indispensable because he: (1) provided Hamilton's counsel with the expertise necessary to assist counsel in rendering legal advice; or (2) was necessary to facilitate communications between Hamilton and her counsel. *See Woodard v. Victory Recs., Inc.,* No. 11 CV 7594, 2013 WL 5951768, at *7 (N.D.Ill. Nov. 7, 2013) (finding no evidence demonstrating that third-party consultant provided the client's counsel "with expertise necessary to assist counsel in rendering legal advice" and there was "nothing to suggest that [the consultant's] involvement was critical to the [client's] attorneys' ability to advise the [client]"); *Universal Standard,* 331 F.R.D. at 88 (emails involving public relations firm not privileged where firm was not "essential" to the communications and "did not serve to improve counsel's understanding of [plaintiff's] request for legal advice"); *Pemberton v. Republic Servs., Inc.,* 308 F.R.D. 195, 202 (E.D.Mo. 2015) (declining to find communications involving a public relations consultant privileged where "it does not appear that defense counsel was reliant on [the consultant's] expertise in order to give appropriate legal advice to Defendants"); *Egiazaryan v. Zalmayev,* 290 F.R.D. 421, 431 (S.D.N.Y. 2013) ("the necessity element means more than just useful and convenient, but rather requires that the involvement of the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications" and holding that client's privilege was waived regarding communications involving public relations consultant because the consultant failed to meet this standard) (internal quotation marks omitted).

12

As in most cases involving public relations consultants, there is no indication here that Robling provided Hamilton's counsel with any expertise that was necessary to enable counsel to provide legal advice to her.[9] *See, e.g., In re New York Renu with Moistureloc Product Liability Litigation*, No. CA 2:06-MN-77777-DCN, 2008 WL 2338552, at *11 (D.S.C. May 8, 2008) (holding that party failed to satisfy its burden of showing that a public relations firm was "necessary" to legal representation when firm did not provide "anything other than ordinary public relations advice"); *LifeVantage Corp. v. Domingo,* No. 2:13-CV-01037-DB-PMW, 2015 WL 5714426, at *2 (D.Utah Sept. 29, 2015) ("Courts have widely rejected claims of attorney-client privilege or work-product protection over communications with public relations firms") (citing multiple cases); *DRFP, LLC v. Republica Bolivariana de Venezuela,* No. 2:04-CV-793, 2015 WL 6122988, at *2 (S.D.Ohio Oct. 19, 2015) ("Venezuela has consistently maintained that disclosure of otherwise privileged documents to a public relations firm is a waiver of the privilege. That is generally true") (citing cases).  Moreover, any suggestion that Robling was necessary to enable counsel to provide legal advice to Hamilton is dispelled by the fact that he is included on only twenty-four out of hundreds of Hamilton's attorney-client communications – including some which relate to the same topics as the communications involving Robling.[10]  (*See generally* Dckt. #386.)

---

[9] Without such a showing of necessity, it is not enough that Robling's involvement in the communications between Hamilton and her counsel may have provided value to Robling and Hamilton or even that Robling's input may have been helpful to counsel "in formulating legal strategy."  *Calvin Klein Trademark Tr. v. Wachner,* 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

[10] For example, Robling was included on some communications related to electioneering, COD financials, and the Open Meetings Act, but was excluded from other communications involving the same topics. (*See e.g.*, REV0003430, REV0004606, REV0069786, REV0069787, REV0069788 (excluding Robling from electioneering e-mails); REV0005331, REV0005338, REV0014925, REV0014926, REV0014946 (excluding Robling from "COD Financials" e-mails); REV0003044, REV0032573, REV0032581, REV0039163 (excluding Robling from Open Meetings Act e-mails).)

This evidence that there were hundreds of communications between Hamilton and her counsel without Robling likewise dispels the notion that Robling's presence was necessary to facilitate communications from Hamilton to her counsel. *See Egiazaryan,* 290 F.R.D. at 433 (finding that any attorney-client privilege waived by disclosure of communications to public relations firm where there was no showing that the firm's involvement was "necessary to facilitate communications" between the client and its counsel); *Calvin Klein,* 198 F.R.D. at 54–55 (communications between client, counsel and public relations consultant not privileged where PR firm served "to assist counsel in assessing the probable public reaction to various strategic alternatives, as opposed to enabling counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice").

Finally, while the Court is sympathetic to the fact that Hamilton suffers from dyslexia, she has not provided any clarity as to how the condition necessitated Robling's involvement with her counsel. In particular, Hamilton has failed to explain why or how her dyslexia impacted her ability to communicate with counsel such that Robling was needed to "enabl[e] counsel to understand aspects of [her] own communications that could not otherwise be appreciated in the rendering of legal advice." *Calvin Klein,* 198 F.R.D. at 55. To the contrary, the fact that Hamilton was able to communicate with counsel on hundreds of occasions without Robling's involvement demonstrates that his presence was not necessary to overcome any adverse effects created by Hamilton's dyslexia.

For all of these reasons, Hamilton has failed to satisfy her burden of showing that her attorney-client privilege over communications including her public relations consultant Robling has not been waived. *Square D Co.*, 264 F.R.D. at 390. Accordingly, Breuder's motion to

compel is granted as to Hamilton and she shall produce the twenty-four emails in question by September 15, 2021.

### C. The Board Shall Produce All Communications Otherwise Covered By Its Attorney-Client Privilege That Involved Robling Prior To May 21, 2015.

The Board has withheld 556 communications involving Robling, arguing that the Board's attorney-client privilege extends to Robling because he "worked for the College from April 2015 through mid-December 2015." (Dckt. #387 at 5.) The College's records establish, however, that Robling began his employment for the College on May 21, 2015 as a part-time, temporary (not to exceed one year) employee. (Dckt. #371-7 & #371-8.) Rather than live with the College's records, the Board muddies the waters by its reliance on Robling's affidavit, in which he makes the imprecise statement that he "worked for the college from approximately April 2015 through mid-December 2015." (Dckt. #371-3.) The Board goes on to assert – again citing only to Robling's affidavit – that Robling assisted with the preparation for the first Board meeting after the election of defendant trustees (which occurred on April 30, 2015) and began his consulting work with "senior administrators" and the Board in April 2015. (Dckt. #387 at 15.)

The Court finds that Robling's imprecise statement of when he began working for the College is insufficient to override the College's employment records as to when he began to work as a College employee. Moreover, the Board – which places all of its eggs in the "Robling was a College employee" basket – does not even attempt to show that Robling, in his role as an informal consultant, falls within the exception to the third-party waiver rule. Consequently, the Court finds that the Board has waived any attorney-client privilege that otherwise existed with respect to the twenty-five communications that were shared with Robling prior to May 21, 2015, the date that Robling was hired by the College. (*See* Dckt. #374 at 8-9 – listing communications

between 4/26/2015 and 5/15/15).  Accordingly, Breuder's motion to compel is granted with respect to these communications and the Board must produce them by September 15, 2021.

> **D.**   **The Current Record Is Insufficient To Determine Whether The Board's Attorney-Client Privilege Extends To Communications Involving Robling During the Time He Was Employed By The College.**

Although Breuder has raised concerns regarding the purportedly unusual circumstances surrounding Robling's hiring by the College and his simultaneous work on behalf of Hamilton and the Board, the Court will accept – consistent with the College's employment records – that Robling was an employee of the College from May 21, 2015 through mid-December 2015.[11] Nevertheless, the Court is without sufficient information on the current record to determine if the Board's attorney-client privilege should extend to Robling in the capacity in which he actually worked for the College.

As Breuder explains, to determine whether a corporate entity's attorney-client privilege extends to an employee under federal law, courts apply the so-called "subject matter" test (as opposed to the narrower "control group" test applicable under Illinois law).  *See Upjohn v. United States*, 449 U.S. 383, 396-97 (1981) (rejecting the control group test in favor of a subject matter-based approach).  Under the subject matter test, the court must determine "whether the communication was made at the instance of the employee's superior and whether the subject matter of the communication, upon which the attorney's advice is sought by the corporation and

---

[11] As the Board points out, plaintiff has not cited any authority to support the proposition that a court may "overlook an employee's status on the basis of a plaintiff's belief that the employee was taking direction from someone else" or that Robling's simultaneous employment waives the Board's right to assert its privilege.  (Dckt. #387 at 7.)

contained within the communication, was within the scope of the employee's duties."[12]  *Barton v. Zimmer Inc.*, No. CIV.A. 1:06-CV-208, 2008 WL 80647, at *4 (N.D.Ind. Jan. 7, 2008); *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15 C 3187, 2020 WL 3977944, at *2 (N.D.Ill. July 14, 2020) ("[T]he attorney-client privilege extends only to an employee who communicates with counsel at the direction of corporate superiors regarding matters within the scope of the employee's duties for the purpose of securing legal advice."); *U.S. ex rel. McGee v. IBM Corp.,* 11 C 3482, 2017 WL 1232616, at *2 (N.D.Ill. Apr. 4, 2017) (same).

The parties dispute the role that Robling actually played as an employee of the College. The Board relies on Robling's affidavit for a description of his duties and actions as a College employee and it does not offer affidavits from President Collins (for whom Robling was purportedly serving as an assistant) or from any other senior College officials or Board trustees. As described in detail in Section I(C), Robling avers that he worked closely with Collins, senior College officials, and Board members on several very important policy issues and that these officials sought his advice and relied upon his recommendations when making key decisions. (Dckt. #371-3 at 3-5.)[13]

---

[12] The Board agrees that the subject matter test is generally applicable under federal law to extend a corporate privilege to lower-level employees, but it nonetheless argues that this test is inapplicable here where Robling is within "the College's control group."  (Dckt. #387 at 12.)  Not only, as discussed below, has the Board failed to substantiate Robling's senior position, but the Supreme Court squarely rejected the control group analysis in *Upjohn*, 449 U.S. at 396-97.  Furthermore, courts have found that "the subject-matter test also covers communications between a corporation's attorney and its control group, *i.e.* those vested with authority both to seek legal advice and to participate significantly in the response to that advice."  *See, e.g., Barry v. Medtronic, Inc.,* No. 1:14-CV-104, 2016 WL 7665426, at *2 (E.D.Tex. Oct. 31, 2016).

[13] In its brief, the Board builds off of Robling's affidavit and asserts that Robling: (1) "was a critical voice on the College's senior leadership team"; (2) was a "necessary participant" in all of the privilege communications; (3) "was consulted before key decisions were made,"; and (4) provided advice that "often guided the College's final decisions."  (Dckt. #387 at 13-15.)  These statements in the Board's brief, however, "are not evidence and do not count" for purposes of the Court's analysis.  *MB Fin. Bank, N.A. v. Walker,* 741 F.Supp.2d 912, 916 (N.D.Ill. 2010) (citing cases)

For his part, Breuder asserts that Robling's declaration should be disregarded entirely because it is contradicted by evidence produced in this litigation, including Robling's own prior deposition testimony. (Dckt. #371 at 3-4.) Breuder is correct that "the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). But the Court has reviewed the portions of Robling's deposition transcript provided and finds that there are no material contradictions between his prior testimony and his affidavit. Consequently, the "sham-affidavit rule" does not require the Court to strike Robling's affidavit.

Breuder further asserts that: (1) Robling's affidavit is not corroborated by the affidavits of senior College officers, any other College administrators, or Board trustees; (2) the vast majority of the communications involving Robling do not also involve the senior College and Board administrators whom Robling was supposedly advising; and (3) only a quarter of the withheld emails (110 out of 442) involving Robling also involve a College administrator, including Collins – whom Robling was purportedly hired to assist. (Dckt. #371 at 13, 17.)

It is typical (as Breuder suggests) for a corporate entity seeking to preserve its attorney-client privilege to offer affidavits from one or more senior officials to corroborate the testimony from a lower-level employee or third-party agent regarding that employee or agent's role with the corporation. *See e.g., The Sols. Team, Inc. v. Oak St. Health, MSO, LLC*, No. 17 CV 1879, 2020 WL 30602, at *2 (N.D.Ill. Jan. 2, 2020) (corporation seeking to extend its privilege to a third-party agent under Illinois law provided declarations of its Chief Technology Officer *and* the third-party agent). It is unclear why the Board did not provide such corroboration in this instance. The Court is reluctant to place decisive weight on Robling's uncorroborated affidavit given that it lacks foundation and is somewhat speculative to the extent that he makes

18

representations as to the degree that the College's senior officials relied on his advice. The Court is also given pause by the apparent fact that most of the withheld communications involving Robling do not also involve the Board and senior College administrators he asserts that he was working closely with and advising.

For these reasons, the Court – while not reaching a firm conclusion – is doubtful that the Board has met its burden of showing that it did not waive its attorney-client privilege over the communications that involve Robling based on the present record. Given that the waiver of privilege is disfavored, *Schmalz v. Vill. of Riverside,* No. 13 C 8012, 2018 WL 1138552, at *2 (N.D.Ill. Mar. 2, 2018), and the large number of communications that are potentially subject to production on account of waiver, the Court finds it appropriate to provide the Board with one last chance to supplement the record before the Court makes its final decision on this matter. *Id.* (granting second chance); *Muro v. Target Corp.,* No. 04 C 6267, 2006 WL 3422181, at *6 (N.D.Ill. Nov. 28, 2006) (same). Accordingly, the Court will deny without prejudice Breuder's motion to compel regarding the communications involving Robling during the time he was actually an employee of the College. The Board is granted until September 29, 2021 to provide Breuder with any additional evidence it chooses to supplement the record on this issue. The parties shall thereafter meet and confer and Breuder is granted leave to file a renewed motion to compel the production of these communications if the parties cannot reach agreement.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to compel Hamilton and the Board to produce improperly withheld communications involving Christopher Robling (Dckt. #370) is granted in part and denied without prejudice in part.


**ENTERED:   September 9, 2021**

**Jeffrey I. Cummings**
**United States Magistrate Judge**